# State of Rhode Island and Providence Plantations

SUPERIOR COURT

**[X] PROVIDENCE/BRISTOL**    **[ ] KENT**      **[ ] WASHINGTON**      **[ ] NEWPORT**

PATRICIA MANNIX, INDIVIDUALLY and as EXECUTRIX ,
FOR THE ESTATE OF MICHAEL MANNIX

CIVIL ACTION, FILE NO.   PC07-5269

................................................................................................

   **Plaintiff**

A.W. CHESTERTON COMPANY et al.

................................................................................................

**Defendant**

*Summons*

**C B S Corporation, n/k/a Viacom Inc.**
Corporation Service Company
**222 Jefferson Blvd.**
**Warwick, RI 02888**

*To the above-named Defendant:*

The above-named Plaintiff has brought an action against you in said superior court in the county indicated above. You are hereby summoned and required to serve upon **Vincent L. Greene, Esq.** Plaintiff's attorney, whose address is **321 South Main Street, Suite 200, Providence, Rhode Island 02903** an answer to the complaint which is herewith served upon you within 20 days after service of this summons upon you, exclusive of the day of service.

If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Your answer must also he filed with the court.

As provided in Rule 13(a) unless the relief demanded in the complaint is for damage arising out of your ownership, maintenance, operation or control of a motor vehicle, or unless otherwise provided in Rule 13(a), your answer must state as a counterclaim any related claim which you may have against the Plaintiff, or you will there-after he barred from making such claim in any other action.

................................................................................................

CLERK

Dated:  October 4, 2007

**A true copy attest**

#6070

**(Seal of the Superior Court)**

**Date**

**S-135** (REV.4/99)

C.I.-153

# State of Rhode Island and Providence Plantations

..........................................,SC

## PROOF OF SERVICE

I hereby certify that on the.................................................day of.........................I served a copy of this

summons and a copy of the complaint received therewith upon ...................................................................…....

...............................................................................................................................................................…....

in the following manner:

By delivering a copy of the summons and complaint to him personally.

By leaving a copy of the summons and complaint at his dwelling house,...........................................…........

....................................……..............................................................................,with a person of suitable age and discretion then
(address)
residing therein.

By leaving a copy of the summons and complaint at his usual place of abode,........................................……

....................................................................................................with a person of suitable age and discretion then
residing therein.

By delivering a copy of the summons and complaint to an agent authorized by appointment or by law

to receive service of process, namely.................................................................................................................…...

Such agent being one designated by statute to receive service, further notice as the statute requires was
given as follows:
....................................................................................................................................................................................
..................................................................................................................................................................................................
......................................................................................................................................................................

Sheriff's Fees
Travel . . . . . . $........................

Service . . . . . $........................            .........................................
                                                  **Deputy Sheriff**
          $........................

Note: Returnable to Plaintiff's Attorney forewith after service. Proof of service to be filed within time during which the person served must respond.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Vincent L. Greene, Esq. MOTLEY RICE LLC 321 South Main Street Providence, RI 02903 | **ATTORNEY FOR PLAINTIFF** | A.W. CHESTERTON COMPANY et al. | VS | PATRICIA MANNIX, INDIVIDUALLY and as EXECUTRIX, FOR THE ESTATE OF MICHAEL MANNIX | **SUPERIOR COURT** | **SUMMONS** | **CIVIL ACTION** **FILE NO.   PC07-5269** |

STATE OF RHODE ISLAND                                    SUPERIOR COURT
PROVIDENCE, SC

PATRICIA MANNIX, Individually and as Execurtix
for the Estate of MICHAEL MANNIX,

     *Plaintiff,*

v.                                                      CIVIL ACTION NO.: PC 07 · 5269

A.W. CHESTERTON COMPANY,
ANCHOR PACKING COMPANY,
BOC GROUP, INC.,
CBS CORPORATION,
  n/k/a VIACOM, INC.,
CARBORUNDUM COMPANY, INC.,
CRANE CO.,
CROWN, CORK & SEAL CO., INC.,
DONLEE TECHNOLOGIES, INC.,
  Individually and as Successor to YORK SHIPLEY, INC.,
EASTERN REFRACTORIES COMPANY, INC.,
ERICSSON RADIO SYSTEMS, INC.,
  Successor-in-interest to ANACONDA WIRE AND CABLE CO.,
FOSTER WHEELER CORPORATION,
GARLOCK, INC.,
GENERAL ELECTRIC COMPANY,
GOULD PUMPS,
H.B. SMITH COMPANY, INC.,
HOBART CORP.,
IMO INDUSTRIES, f/k/a IMO DELAVAL,
INGERSOLL-RAND COMPANY,
JOHN CRANE, INC.,
LINCOLN ELECTRIC CORPORATION,
METROPOLITAN LIFE INSURANCE COMPANY,
MINNESOTA MINING & MANUFACTURING COMPANY,
  a/k/a 3MCOMPANY,
OKONITE COMPANY,
P.I.C. CONTRACTORS, INC.,
PACKINGS & INSULATIONS CORPORATION,
RAPID AMERICAN CORPORATION, and
WARREN PUMPS,
JOHN DOE (fictitious name),

     *Defendants.*

Received 10/3/07

## COMPLAINT AND JURY DEMAND

1.      Plaintiffs are citizens and residents of the State of Rhode Island. They reside at 111 Colonel J. Gardner Road, Narragansett, Rhode Island 02882. Michael Mannix ("Plaintiff-worker") was injuriously exposed to asbestos as follows:  Michael Mannix was a member of the United States Navy from approximately 1965 to 1969. During this time he served as a machinist mate, second class, on board the USS Saratoga (CVA-60) and was stationed out of the Philadelphia Navy Shipyard in Pennsylvania and the Mayport Navy Yard in Florida. Prior to his enlistment, Mr. Mannix worked at International Paper in Ticonderoga, New York, part time from approximately 1962 to 1965 and during the summers in 1969 and 1970.  While employed at International Paper, his primary duties were steamfitter and pipefitter.  From approximately 1974 until 1978, Mr. Mannix was employed as a welder at Electric Boat in Groton, Connecticut. Finally, Mr. Mannix was employed as a welder at Electric Boat in North Kingstown, Rhode Island from approximately 1979 until 1987.  As a direct result of his exposure to asbestos, he suffered and died from mesothelioma.  His wife, Patricia Mannix ("Plaintiff-spouse") makes a claim for loss of consortium due to her husband's asbestos-related disease.

2.      Defendant A.W. Chesterton Company is a Massachusetts corporation with its principal place of business in Massachusetts.  At all relevant times it did business in the State of Rhode Island.

3.      Defendant Anchor Packing Company is a New Jersey corporation with its principal place of business in North Carolina.  At all relevant times it did business in the State of Rhode Island.

4.      Defendant BOC Group, Inc. is a New Jersey corporation with its principal place of business in Delaware.  At all relevant times it did business in the State of Rhode Island.

5.      Defendant CBS Corporation, n/k/a Viacom, Inc., is a New York corporation with its principal place of business in New York.  At all relevant times it did business in the State of

Rhode Island.

6. Defendant <u>Carborundum Company</u> is a New York corporation with its principal place of business in New Jersey. At all relevant times it did business in the State of Rhode Island.

7. Defendant <u>Crane Co.</u> is a New Jersey corporation with its principal place of business in New Jersey. At all relevant times it did business in the State of Rhode Island.

8. Defendant <u>Crown, Cork & Seal Company, Inc.</u>, is a New York corporation with its principal place of business in Pennsylvania. At all relevant times it did business in the State of Rhode Island.

9. Defendant <u>Donlee Technologies, Inc., Individually and as Successor to York Shipley, Inc.</u> is a Connecticut corporation with its principal place of business in Connecticut. At all relevant times it did business in the State of Rhode Island.

10. Defendant <u>Eastern Refractories Company, Inc.</u> is a Massachusetts corporation with its principal place of business in Massachusetts. At all relevant times it did business in the State of Rhode Island.

11. Defendant <u>Ericsson Radio Systems, Inc.</u> is a Texas corporation with its principal place of business in Texas. At all relevant times it did business in the State of Rhode Island.

12. Defendant <u>Foster Wheeler Corporation</u> is a New York corporation with its principal place of business in New Jersey. At all relevant times it did business in the State of Rhode Island.

13. Defendant <u>Garlock, Inc.</u>, is a New York corporation with its principal place of business in New York. At all relevant times it did business in the State of Rhode Island.

14. Defendant <u>General Electric Company</u> is a New York corporation with its principal place of business in New York. At all relevant times it did business in the State of Rhode Island.

15. Defendant <u>Gould Pumps Incorporated</u> is a New Jersey corporation with its

principal place of business in New Jersey. At all relevant times it did business in the State of Rhode Island.

16.     Defendant H.B. Smith Company, Inc. is a Massachusetts corporation with its principal place of business in Massachusetts. At all relevant times it did business in the State of Rhode Island.

17.     Defendant Foster Wheeler Corporation is a New York corporation with its principal place of business in New Jersey. At all relevant times it did business in the State of Rhode Island.

18.     Defendant Garlock, Inc., is a New York corporation with its principal place of business in New York. At all relevant times it did business in the State of Rhode Island.

19.     Defendant General Electric Company is a New York corporation with its principal place of business in New York. At all relevant times it did business in the State of Rhode Island.

20.     Defendant Georgia-Pacific Corporation is a Georgia corporation with its principal place of business in Georgia. At all relevant times it did business in the State of Rhode Island.

21.     Defendant H.B.Smith Company, Inc. is a Massachusetts corporation with its principal place of business in Massachusetts. At all relevant times it did business in the State of Rhode Island.

22.     Defendant Hobart Corporation. is an Ohio corporation with its principal place of business in Ohio. At all relevant times it did business in the State of Rhode Island.

23.     Defendant IMO Industries, f/k/a IMO Delaval is a New Jersey corporation with its principal place of business in New Jersey. At all relevant times it did business in the State of Rhode Island.

24.     Defendant Ingersoll-Rand Co. is a New Jersey corporation with its principal place of business in New Jersey. At all relevant times it did business in the State of Rhode Island.

25.     Defendant John Crane, Inc. is a Delaware corporation with its principal place of

business in Illinois. At all relevant times it did business in the State of Rhode Island.

26.     Defendant <u>Lincoln Electric Company</u> is a Ohio corporation with its principal place of business in Ohio. At all relevant times it did business in the State of Rhode Island.

27.     Defendant <u>Metropolitan Life Insurance Company</u> is a mutual life insurance company of the State of New York with its principal place of business in the State of New York. At all relevant times it did business in the State of Rhode Island.

28.     Defendant <u>Minnesota Mining &Manufacturing Company</u>, is a Delaware corporation with its principal place of business in Delaware. At all relevant times it did business in the State of Rhode Island.

29.     Defendant <u>Okonite Company</u> is a New Jersey corporation with its principal place of business in New Jersey. At all relevant times it did business in the State of Rhode Island.

30.     Defendant <u>P.I.C. Contractors, Inc.</u> is a Rhode Island corporation with its principal place of business in Rhode Island. At all relevant times it did business in the State of Rhode Island.

31.     Defendant <u>Packings and Insulations Corporation</u> is a Rhode Island corporation with its principal place of business in Rhode Island. At all relevant times it did business in the State of Rhode Island.

32.     Defendant <u>Packings and Insulations Corporation</u> is a Rhode Island corporation with its principal place of business in Rhode Island. At all relevant times it did business in the State of Rhode Island.

33.     Defendant <u>Rapid American Corporation</u> is a Delaware corporation with its principal place of business in Delaware. At all relevant times it did business in the State of Rhode Island.

Through a series of corporate mergers, Rapid American Corporation expressly assumed all liabilities and debts of Philip Carey Manufacturing Company. Philip Carey Manufacturing Company has sufficient contracts with and/or did business in the State of Rhode Island such that

it and all successor corporations including Rapid American Corporation has sufficient contracts and/or transacts business within the State of Rhode Island to subject them to the jurisdiction of this Court.

34. Defendant <u>Warren Pumps</u> is a Massachusetts corporation with its principal place of business in Massachusetts. At all relevant times it did business in the State of Rhode Island.

35. Defendant <u>John Doe</u> (fictitious) represents one or more business entities whose real names and identities are presently unknown to Plaintiff.

COUNT I

36. Plaintiff repeats and realleges all allegations contained in all paragraphs above as if fully set forth herein.

37. Defendants mined, processed, manufactured, designed, supplied, delivered, and sold asbestos and asbestos-containing products and/or knowingly gave substantial assistance or encouragement to those who did so, at all times relevant herein.

38. While at work, Plaintiff-worker was caused to inhale, absorb, ingest, and come into contact with asbestos and asbestos-containing products mined, processed, manufactured, designed, supplied, delivered, and/or sold by Defendants.

39. The Defendants were negligent in that they each, jointly and severally:

    a. mined, processed, manufactured, designed, supplied, delivered, and/or sold asbestos and asbestos-containing products, and/or knowingly gave substantial assistance or encouragement to those who did so, that they knew, or reasonably should have known, were dangerous, defective, poisonous, and harmful to an individual's health, body, and life;

    b. failed to reasonably warn Plaintiffs of the harmful effects of exposure to asbestos and asbestos-containing products and/or knowingly gave substantial assistance or

6

encouragement to those who did so;

        c.      failed to provide Plaintiffs with the knowledge as to possible precautions to protect against the harmful effects of asbestos exposure and/or knowingly gave substantial assistance or encouragement to those who did so; and,

        d.      were otherwise negligent.

40.     As a direct and proximate result of the negligence of the Defendants, Plaintiff-worker suffered serious bodily injury, endured great pain and suffering, incurred medical and funeral expenses, suffered mental anguish, lost earnings and earning capacity, and was otherwise damaged. As a direct and proximate result of the negligence of the Defendants, Plaintiff-worker ultimately died.

41.     As a direct and proximate result of the negligence of the Defendants, Plaintiff-spouse has suffered, and will continue to suffer great pain and suffering, mental anguish, a loss of consortium, society, companionship, support, and dependency, and was otherwise damaged.

WHEREFORE Plaintiffs demand judgment and damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

## COUNT II

42.     Plaintiff repeats and realleges all allegations contained in all paragraphs above as if fully set forth herein.

43.     At all relevant times, the Defendants, as part of their regular business, mined, processed, manufactured, designed, supplied, delivered, and sold and/or knowingly gave substantial assistance or encouragement to those who did so, asbestos and asbestos-containing products and put them into the stream of commerce in a defective, unsafe, and inherently

dangerous condition, and failed to provide reasonable warnings.

44.     The asbestos and asbestos-containing products were expected to, and did reach such persons, including Plaintiff-worker, without substantial change in the condition in which they were sold and/or supplied.

45.     At all relevant times, the asbestos and asbestos-containing products were used and employed for the purposes for which they were mined, processed, manufactured, designed, supplied, delivered, sold, and intended to be used and in a manner foreseeable to the Defendants.

46.     As a direct and proximate result of the defective, dangerous, and unsafe condition of the asbestos and asbestos-containing products that Defendants placed into the stream of commerce, Plaintiff-worker suffered serious bodily injury, endured great pain and suffering, incurred medical and funeral expenses, suffered mental anguish, lost earnings and earning capacity, and was otherwise damaged. As a direct and proximate result of the defective, dangerous, and unsafe condition of the asbestos and asbestos-containing products that Defendants placed into the stream of commerce, Plaintiff-worker ultimately died.

47.     As a direct and proximate result of the defective, dangerous, and unsafe condition of the asbestos and asbestos-containing products that Defendants placed into the stream of commerce, Plaintiff-spouse has suffered, and will continue to suffer, great pain and suffering, mental anguish, a loss of society, consortium, companionship, support, dependency and was otherwise damaged.

WHEREFORE Plaintiff demands judgment and damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

## COUNT III

8

Case 1:18-cv-00558-WES-PAS Document 1-1 Filed 10/09/18 Page 11 of 24 PageID #: 17

48.     Plaintiff repeats and realleges all allegations contained in all paragraphs above as if fully set forth herein.

49.     The Defendants expressly and impliedly warranted that the asbestos and asbestos-containing products that they mined, processed, manufactured, designed, supplied, delivered, and sold were fit for use, were merchantable, and were reasonably safe for the purpose intended.

50.     The Defendants breached their warranty in that the asbestos and asbestos-containing products were defective, unsafe, unreasonably dangerous, ultrahazardous, and unsuitable for the purpose intended.

51.     As a direct and proximate result of the breach by the Defendants, Plaintiff-worker suffered serious bodily injury, endured great pain and suffering, incurred medical and funeral expenses, suffered mental anguish, lost earnings and earning capacity, and was otherwise damaged. As a direct and proximate result of the breach by the Defendants, Plaintiff-worker ultimately died.

52.     As a direct and proximate result of the breach by the Defendants, Plaintiff-spouse has suffered, and will continue to suffer great pain and suffering, mental anguish, a loss of consortium, society, companionship, support, and dependency, and was otherwise damaged.

WHEREFORE Plaintiff demands judgment and damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

## COUNT IV

53.     Plaintiff repeats and realleges all allegations contained in all paragraphs above as if fully set forth herein.

9

54.     The acts and omissions of Defendants that were the direct and proximate cause of Plaintiffs' injuries were willful, malicious, wanton, undertaken with reckless disregard of the rights of Plaintiffs, and were grossly negligent.

WHEREFORE Plaintiff demands judgment and punitive damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

## COUNT V

55.     Plaintiff repeats and realleges all allegations contained in all paragraphs above as if fully set forth herein.

56.     Defendants, individually and as agents of one another and as co-conspirators, aided, abetted, encouraged, counseled, assisted, agreed, and conspired among themselves and with other asbestos manufacturers and distributors to injure Plaintiffs.

57.     The Defendants knew that the others' conduct constituted a breach of duty and gave substantial assistance or encouragement to the other so to conduct itself.

58.     The Defendants acted in the following fashion:

a.     Metropolitan Life Insurance Company (Met Life) required a tangible quid pro quo from McGill University in the 1920s in exchange for them providing funding for a study of asbestos disease in Canadian miners. The study revealed asbestos miners suffered from asbestosis. The study was never published and agents of Met Life materially misrepresented in the published literature this known fact.

b.     In 1932, Met Life, through its agents Dr. Anthony Lanza, Dr. Fellows, and others, assisted the Johns-Manville Corporation with medical examinations of over 1,000 employees of Johns-Manville's factory in Manville, New Jersey. The report of his study shows

10

that a large percentage of the employees suffered from asbestosis including employees not directly involved in the manufacturing process. This 1932 medical survey was not published in the medical literature and therefore was unavailable to scientists studying the issue of asbestos disease. Further collaboration between the conspiring asbestos producers and Met Life officials continued this trend of intentional cover-up.

      c.      Beginning in approximately 1934, Johns-Manville Corporation, through its agents, Vandiver Brown and attorney J.C. Hobart, and conspirator Raybestos-Manhattan, through its agents, Sumner Simpson and J. Rohrbach, suggested to Dr. Lanza, Associate Medical Director of Met Life (insurers of Manville, Raybestos, and others) that Dr. Lanza publish a study on asbestosis in which Dr. Lanza would affirmatively misrepresent a material fact about asbestos exposure; i.e., the seriousness of the disease process, asbestosis. This was accomplished through intentional deletion of Dr. Lanza's description of asbestosis as "fatal" and through other selective editing at the behest of the asbestos industry that affirmatively misrepresented asbestos as a disease process less serious than it actually is and was known to be then. As a result, Dr. Lanza's study was published in the medical literature in this misleading fashion in 1935. The defendants were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in lawsuits involving Manville, Raybestos, and others, as well as Met Life, the insurer.

      d.      In 1936, conspirators American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasby & Mattison Company (then an alter-ego to conspirator Turner & Newall), Raybestos-Manhattan, Russell Manufacturing (whose liabilities have been assumed by H.K. Porter Company), Union Asbestos

11

and Rubber Company, and United States Gypsum Company, entered into an agreement with the Saranac Laboratories. Under this agreement, these companies acquired the power to decide what information Saranac Laboratories could publish about asbestos disease and control in what form such publications were to occur. This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study. On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data resulting in numerous misstatements of fact being made at scientific meetings.

e.     On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation: American Brake Block Division of American Brake and Shoe Foundry, Gatke Corporation, Keasby & Mattison Company (then an alter-ego to conspirator Turner & Newall) Raybestos-Manhattan, Inc., Thermoid Company (whose assets and liabilities were later purchased by H.K. Porter Company,) Union Asbestos and Rubber Company and United States Gypsum Company. U.S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

f.     At this November 11, 1948 meeting, these defendants and their representatives decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical review of the then-existing standards of dust exposure for asbestos and asbestos-containing products.

g.     At this meeting, the defendants intentionally and affirmatively determined

12

that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and the critique of the dust standards and then published it in the medical literature as edited by Dr. Arthur Vorwald. The acts of these defendants were carried out by co-conspirator Defendant Met Life's agent, Dr. Lanza. These defendants thereby fraudulently misrepresented the risks of asbestos exposure to the public, in general, and the class of persons exposed to asbestos, including Plaintiffs.

h. As a direct result of influence exerted by the above-described conspirators, Dr. Vorwald published Dr. Gardner's edited work in January, 1951, in the Archives of Industrial Hygiene and Occupational Medicine (Vol. 3, No. 1), a journal of the American Medical Association. The published version stressed those portions of Gardner's work that the conspirators wished stressed, but omitted references to cancer, to human asbestosis, and to the inadequacy of the then-established threshold limit values (TLVs). Furthermore, that article made a false claim that the published report was the "complete survey" of Dr. Gardner's work. The defendants thereby fraudulently, affirmatively, and deliberately disseminated this misleading Dr. Vorwald publication to university libraries, government officials, medical doctors, agencies, the public, and others.

i. Such action constituted a material affirmative misrepresentation of the total context of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated.

j. The following conspirators and others were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.): Johns-Manville

13

Corporation, Carey-Canada (individually and as successor to Quebec Asbestos Corporation), the Celotex Corporation (successor to Quebec Asbestos Corporation) National Gypsum Company (n/k/a Asbestos Claims Management Corporation), and Turner & Newall (individually and successor to Bell Asbestos). The members of Q.A.M.A. participated in the above-described misrepresentation of the work of Dr. Gardner published by Dr. Vorwald in the A.M.A. 's <u>Archives of Industrial Hygiene and Industrial Medicine</u> in 1951. Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership in the Q.A.M.A., as well as correspondence from co-conspirators all indicating close monitoring of the editing process by Q.A.M.A.'s representative, Ivan Sabourin, acting on behalf of all Q.A.M.A.'s members.

k.      Defendants who were members of the Q.A.M.A., began on or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory controls of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

l.      This plan of misrepresentation and influence over the medical literature began on or about 1950 when the Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos. After a preliminary report authored by Dr. Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, the Q.A.M.A. members refused to further fund the study and it was terminated and never publicly discussed.

m.      As a result of the termination of this study, these defendants fraudulently

14

withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators' agents Dr. Kenneth W. Smith, Dr. Paul Cartier, Dr. Arthur J. Vorwald, Dr. Anthony J. Lanza, Vandiver Brown, and Ivan Sabourin, said misrepresentations being directed to, inter alia, U.S. Government officials, Canadian government officials, U.S. National Cancer Institute, other medical organizations, and the general public, including Plaintiffs.

n.     Subsequently, the Q.A.M.A. defendant conspirators contracted with the Industrial Hygiene Foundation (I.H.F.) and Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Truan reported to the Q.A.M.A that asbestosis did increase a worker's chances of incurring lung cancer.

o.     The Q.A.M.A. defendants thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out by agents of the Q.A.M.A. The published version of this study contained a conclusion that asbestos exposure did not increase the incidence of lung cancer, a conclusion known by the defendant conspirators to be patently false.

p.     By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting a documented finding that asbestosis did increase the risk of lung cancer, the Q.A.M.A. defendants affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers.

q.     In approximately 1958, the Q.A.M.A. defendants publicized the edited works of Drs. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the

15

public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

r.    The fraudulent misrepresentations beginning in 1946, as elaborated above and continuing with the publication of the 1958 Braun/Truan study, influenced the standards set for the TLVs, and inhibited the lowering of the threshold limit value due to the cancer risk associated with asbestos inhalation.

s.    In 1967, the Q.A.M.A. defendants determined at their trade association meeting that they would intentionally mislead consumers about the extent of risks involved in inhalation of asbestos products.

t.    In 1952, a symposium regarding the health effects of asbestos was held at the Saranac Laboratories.  The following conspirators were in attendance:   Johns-Manville, Turner & Newall, Raybestos-Manhattan, and Q.A.M.A. members by way of their agents, Cartier, Sabourin, and LeChance.

u.    At this meeting, the occurrence of lung cancer and asbestosis in product users was discussed and the carcinogenic properties of all fiber types of asbestos was also discussed.  In an affirmative attempt to mislead the public about the extent of health risks associated with asbestos, and in an effort to fraudulently conceal those risks from the public, these defendants conspired to prevent publication of the record of this 1952 Saranac Symposium and it was not published.  In addition, the conspirators induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal studies showing excess cancers in animals that thereby fraudulently misrepresenting existing data, albeit secret, that could not be publicized because of the secrecy provisions contained in the 1936 Saranac agreement required by the asbestos industry members.

16

v.    The following conspirators were members of the Magnesia Insulation Manufacturers Association (MIMA):    Philip-Carey Corporation (predecessors to Celotex) Johns-Manville, and others.

w.    In 1955, these conspirators caused to be published the MIMA 85% Magnesia Insulation Manual.    This manual falsely and fraudulently misrepresented that asbestos-containing products offered no hazard to workers who used these products.

x.    The following conspirators were members of the trade organization known as the Asbestos Textile Institute (ATI):    Raybestos-Manhattan, Johns-Manville, H.K. Porter, Keasby & Mattison (individually and through its alter-ego Turner & Newall), National Gypsum (n/k/a Asbestos Claims Management Corporation), and others.

y.    In 1947, the members of the ATI, received a report from W.C.L. Hemeon regarding asbestosis that suggested re-evaluation of the then-existing TLVs for asbestos exposure. These defendants caused this report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and class of persons exposed to asbestos that the then-existing TLV was acceptable.    Thereafter, these defendant conspirators withheld additional material information on the dust standards from The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of TLVs for asbestos exposure.

z.    In 1953, conspirator National Gypsum (n/k/a Asbestos Claims Management Corporation), through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the products.    National Gypsum's response distorted and fraudulently

17

misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators.

aa.    In 1955, conspirator Johns-Manville, through its agent Kenneth W. Smith, M.D. caused to be published in the AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in Asbestos Workers." This published study materially altered the results of an earlier study in 1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation.

bb.    In 1955, the National Cancer Institute held a meeting at which conspirators Johns-Manville (individually and as an agent for other alleged co-conspirators) and Dr. Vorwald (as agent of co-conspirators) affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer, when, in fact, the conspirators were in secret possession of several studies that demonstrated that positive evidence did exist.

cc.    In 1957, the members of the ATI, jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulent concealment from the public of material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of the then-existing knowledge about asbestos exposure and lung cancer.

dd.    In 1964 the members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr. Irving J. Selikoff. Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

ee.    In 1970, through their agents, Defendants The Celotex Corporation and

18

Carey-Canada, affirmatively misrepresented that it had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease. This constituted a fraudulent misrepresentation about the material facts known to these Defendants.

ff.    All conspirators approved and ratified and furthered the previous conspiratorial acts of conspirators Johns-Manville, Raybestos Manhattan, and Anthony J. Lanza, M.D., acting on behalf of Met Life, and all alleged co-conspirators during the relevant time period and circumstances alleged above, acted as agents and co-conspirators for the other conspirators.

59.    All defendants:

a.    did a tortious act in concert with the other or pursuant to a common design with them; and/or

b.    knew that each other's conduct constituted a breach of duty and they each gave substantial assistance or encouragement to the other so to conduct himself; and/or

c.    gave substantial assistance to the other in accomplishing a tortious result and its own conduct, separately considered, constitutes a breach of duty to the Plaintiffs.

60.    The acts of the defendants as described above, constitute a fraudulent concealment and/or a fraudulent misrepresentation that proximately caused injury to the Plaintiffs in the following manner:

a.    The material published or caused to be published by the defendants was false and incomplete in that the Defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-containing products.

b.    Defendants individually, as members of a conspiracy, as agents of other co-conspirators, and as aiders and abettors of each other intended that the publication of false and

19

misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos:

       i.      maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

      ii.     assist in the continued pecuniary gain of the defendants through the sale of their products;

     iii.    influence in the defendants' favor proposed legislation to regulate asbestos exposure and;

     iv.    to provide a defense in lawsuits brought for injury resulting from asbestos disease.

     c.    Plaintiffs reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-containing products and the absence of published medical and scientific reports on the extent, nature, and existence of hazards of asbestos and asbestos-containing products to continue exposure to asbestos because of a belief that it was safe.

     d.    Defendants individually, as members of a conspiracy, and as agents of each other intended that Plaintiffs rely upon the published report regarding the safety of asbestos and asbestos-containing products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, to continue his exposure to these products.

     e.    Defendants individually, as members of a conspiracy, as agents of each other, as aiders and abettors of each other are and were in a position of superior knowledge regarding the health hazards of asbestos and therefore Plaintiffs had a right to rely on the

published reports commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products.

      f.    Plaintiff suffered and will continue to suffer injury as a direct and proximate result of the acts alleged herein.

61.    As a direct and proximate result of the acts of the Defendants, Plaintiff-worker suffered serious bodily injury, endured great pain and suffering, incurred medical expenses, suffered mental anguish, lost earnings and earning capacity, and was otherwise damaged. As a direct and proximate result of the acts of the Defendants, Plaintiff-worker ultimately died.

62.    As a direct and proximate result of the acts of the Defendants, Plaintiff-spouse has suffered, and will continue to suffer great pain and suffering, mental anguish, a loss of consortium, society, companionship, support, and dependency, and was otherwise damaged.

21

WHEREFORE Plaintiff demands judgment and damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

Plaintiff hereby demand a trial by jury.

Respectfully Submitted by,
***MOTLEY RICE LLC***

John J. McConnell, Jr., Esq. (#3016)
Robert J. McConnell, Esq. (#3888)
Donald A. Migliori, Esq. (#4936)
Vincent L. Greene, Esq. (#5971)
321 South Main Street, 2nd Flr.
P.O. Box 6067
Providence, RI  02940-6067
401-457-7700
401-457-7708 Fax

Providence, R.I.
Dated:  10|03|07

22